Filed 7/6/26  P. v. Barnett CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064904 |
| v. | (Super. Ct. No. FSB053188-4) |
| MICHAEL BARNETT, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, Gregory S. Tavill, Judge. Affirmed.

Bruce L. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, James M. Toohey and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

In 2008, defendant Michael Barnett, Jr. was convicted of murder, two counts of attempted murder, and other crimes for participating in a gang-related shooting in San Bernardino. This appeal concerns Barnett's Penal Code section 1172.6 petition for resentencing on only one of the attempted murder counts.[1] Barnett contends there is insufficient evidence to support the trial court's finding that he is ineligible for resentencing on that count because he aided and abetted the attempted murder. We disagree and affirm the court's postjudgment denial order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE ORIGINAL TRIAL COURT PROCEEDINGS[2]

"PPHG [(Pimps, Playboys, Hustlers and Gangsters)] member Barry Jones's [2005] shooting death precipitated the events in this case. Jones, [co]defendant [Sinque] Morrison, and PPHG affiliate Alonzo Monk sought to purchase marijuana at Lynwood Apartments in San Bernardino, but became embroiled in a gun battle with members of a rival gang, the Rolling 60's. Jones was shot and died at a nearby hospital.

"Jones's cousin and fellow PPHG member, Shawn Davis, learned of Jones's death and found Morrison and other PPHG members at the home of PPHG's leader, Sidikiba Greenwood. Morrison explained he panicked after

---

[1] Penal Code section 1172.6 originally was housed in Penal Code section 1170.95, but it subsequently was renumbered without substantive change in 2022. (Stats. 2022, ch. 58, § 10.) For ease of reference, we refer to the current provision. All further statutory references are to the Penal Code.

[2] Like the parties, we quote the facts from this court's prior opinion in Barnett's direct appeal. (*People v. Barnett* (July 28, 2011, G041416) [nonpub. opn.] (*Barnett I*).) The trial court judicially noticed the record from that earlier case, and we have done the same.

2

the shooting and drove around with Jones in the car for awhile before dropping him off at the hospital.

"Within days, Jones's family held a car wash to raise money for his burial. PPHG members attended the car wash, including Morrison and Barnett. According to Davis, Morrison blamed the Rolling 60's for Jones's death and urged revenge, stating, '[W]e was [*sic*] going over there [to] take care of business, and Niggers going to get killed . . . .' Greenwood similarly exhorted the group, '[O]ur homie just got killed. You guys are just going to let this ride?' Someone mentioned a so-called four-day rule among PPHG members, requiring retaliation within four days.

"Davis called Monk after the car wash to meet at Greenwood's home for further planning. According to Monk, Morrison and Barnett were at the meeting, along with Patrick Lair and several other PPHG members. Lair testified Morrison concluded, '[W]e can't let it ride. We can't let them get away with killing Little J-Blue,' a reference to Jones. Monk armed Morrison with a semiautomatic weapon and the .357-caliber revolver Jones used in the fatal shootout. Morrison or his brother departed the meeting briefly and returned with a duffle bag containing an assault rifle and a hunting rifle. When the assault rifle fell to Harold Phillips, Monk questioned his ability to handle the weapon, but Morrison threatened, 'He better know how to use it' or Morrison would 'shoot him in his head if not.' Davis testified Greenwood armed him and Lair with .45-caliber semiautomatic weapons before informing the PPHG cohort it was time to '[g]o take care of your business.' The men piled into four different cars; according to Monk, everyone was armed and prepared to retaliate for Jones's death.

"One of the eventual victims, Jaynita McWilliams, testified she and two of her sisters, including Mynisha [Crenshaw], noticed several cars

3

filled with 'a lot' of men drive slowly past them as they walked home to Lynwood Apartments. [Jaynita] relayed the incident to her mother, who warned the girls to stay in the apartment.

"In the meantime, Morrison arrived at the apartments in the lead car. A resident of the apartment complex observed a group of eight men, dressed in black with rags covering their faces, exit the vehicles. One of the men pulled weapons from a vehicle's backseat and distributed them. The group then proceeded into the apartment complex. Another resident looked down from her apartment and saw the men, all armed, walking through the complex. Barnett, who had separated from the group to serve as a lookout, returned on the run, stating an armed man was approaching. A shot rang out from Barnett's group. Davis had fired his weapon at the approaching man, who turned out to be Davis's cousin, Lucky Kelly. Kelly was unharmed, but the group panicked and returned to their vehicles. Some departed, but the remainder, including Morrison and Barnett, acted swiftly when a PPHG member, Marquis Taylor, ran up to the group claiming apartment 22 belonged to the Rolling 60's.

"Morrison, Barnett, and several others made their way to apartment 22, lined up in formation outside the apartment, and fired a barrage of up to 30 shots into the apartment. Investigators later recovered .45-caliber and nine-millimeter casings and a live .22-caliber round at the apartment. Eleven-year-old Mynisha Crenshaw suffered four gunshot wounds, including a fatal shot that passed through her chest, right lung, heart, aorta, and pulmonary artery. She bled to death. Her sister Jaynita suffered a gunshot that shattered the bones in her right arm, requiring a prosthesis and continuing therapy.

4

"The PPHG members returned to Greenwood's home as he had instructed them. Lair, who saw Morrison and Barnett standing in formation outside apartment 22 and saw Morrison fire into the apartment, had been left behind by the group. Morrison 'discipline[d]' Barnett and another PPHG member by inflicting a beating on them for leaving Lair behind. Lair took a cab home.

"In a police interview, Barnett admitted his lookout role at the scene and corroborated the attack on apartment 22, including shots from an assault rifle, and he confirmed the earlier shot fired at Kelly. He also admitted his presence at the carwash and knowledge of PPHG discussions at Greenwood's house about avenging Jones's death.

"Lair and Davis disclosed threats against their lives and against close relatives if they testified. Lair received a 'kite' or note in prison that warned him, '[Y]ou['re] dead if you get on the stand and we know that you gave a statement [and] that you're supposed to get on the stand against us . . . if we can't get you, we are going to kill someone close to you . . . we're going to kill one of your family members. We're going to kill your mom, somebody.' The kite instructed Lair to 'play crazy when you get on the stand. That way you might get lucky and be able to keep your deal . . . .'

"One of the sisters walking home with Jaynita before the shooting identified Morrison as an occupant in the lead car of the caravan that passed her and her sisters. The prosecution's gang expert, Detective Travis Walker of the San Bernardino Police Department, identified Morrison as an 'original gangster' who joined PPHG around 1986 or 1987, near the time of its founding, and climbed to the top tier of PPHG's hierarchy. The expert further explained that Morrison's presence at Jones's slaying entailed a special duty to participate in the retaliatory strike. The police began

5

searching for Morrison within 11 hours of the slaying, but [Morrison] had fled to Georgia, where he was arrested three weeks later.

"Walker opined that if eight to 12 armed PPHG members traveled to rival gang territory four days after a PPHG had been killed in the same neighborhood, it was foreseeable someone would die. The increased notoriety from a successful retaliatory strike, particularly in an armed advance into another gang's turf and in killing a rival gang member, would benefit the gang, whereas failing to retaliate would show weakness and invite further predation by other gangs. But because PPHG killed an innocent girl, PPHG's reputation actually suffered." (*Barnett I, supra*, G041416.)

The jury convicted Barnett and Morrison of murdering Mynisha, attempting to murder Jaynita and Kelly, conspiring to commit murder, and shooting at an inhabited dwelling. (§§ 187, subd. (a), 664/187, subd. (a), 182, subd. (a)(1), 246.) The jury also found true allegations that a principal discharged a firearm causing death or great bodily injury and the crimes were committed for the benefit of a criminal street gang. (§§ 12022.53, subds. (b)–(e)(1), 186.22, subd. (b)(1).) The trial court sentenced Barnett to a cumulative term of 101 years to life in prison. His convictions were affirmed on appeal in 2011. (*Barnett I, supra*, G041416.)

II.

THE RESENTENCING PROCEEDINGS

In 2019, the trial court summarily denied Barnett's petition for resentencing on his murder conviction and his two attempted murder convictions. On appeal, another panel of this court affirmed with respect to the murder conviction and remanded for further proceedings with respect to the attempted murder convictions. (*People v. Barnett* (July 28, 2022, G059192) [nonpub. opn.] (*Barnett II*).)

6

On remand, the trial court conducted an evidentiary hearing pursuant to section 1172.6, subdivision (d). Neither party admitted any new evidence at the hearing, and the matter was decided based on the record of Barnett's underlying trial. Barnett argued he was entitled to resentencing on the attempted murder count involving Kelly because he did not intend to kill Kelly. The trial court disagreed. It denied Barnett's petition as to both counts of attempted murder on the basis he aided and abetted the actual perpetrator with the intent to kill.

## DISCUSSION

Barnett's appeal is limited to the attempted murder count involving Kelly. As he did in the trial court, Barnett maintains he is entitled to resentencing on that count because he did not harbor the intent to kill Kelly. We disagree.

At the evidentiary stage of a section 1172.6 resentencing petition, the prosecution has the burden to prove beyond a reasonable doubt the defendant is ineligible for resentencing because his conduct constituted murder or attempted murder under current law. (§ 1172.6, subd. (d).) In attempted murder cases where the defendant is not the actual perpetrator, that requires proof the defendant aided and abetted the actual perpetrator with the intent to kill. (*People v. Curiel* (2023) 15 Cal.5th 433, 441, 463.)

Barnett mounts a two-pronged attack on the trial court's finding that he acted with the requisite intent to kill as to Kelly. First, the evidence shows he wanted to kill rival gang members, not Kelly. Barnett argues this is significant because the doctrine of transferred intent does not apply in the context of attempted murder. (See *People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*).) However, that particular circumstance does not avail Kelly in his quest for relief.

7

The doctrine of transferred intent applies when the defendant shoots at one victim with malice aforethought, but misses his intended target and kills someone else instead. (*People v. Lopez* (2024) 99 Cal.App.5th 1242, 1247.) In that situation—known as the "'bad aim'" scenario (*People v. Williams* (1980) 102 Cal.App.3d 1018, 1027, fn. 5 (*Williams*))—the defendant's intent to kill can be used to support a charge of murder as to the unintended victim. (*Bland, supra,* 28 Cal.4th at p. 331.) But if the unintended victim survives, the defendant's intent to kill cannot be used to support a charge of attempted murder as to the unintended victim. (*Ibid*.) Because Kelly survived the shooting by Davis, Barnett argues the transferred intent theory is inapt here.

We agree. In this case, however, the shooter Davis did not have bad aim. Rather, it simply turned out that his target was someone other than he expected. *Williams* makes clear that, in cases of victim misidentification such as this, the doctrine of transferred intent is unnecessary because, "the target at which defendant actually aimed *is* the victim." (*Williams, supra,* 102 Cal.App.3d at p. 1027, fn. 5, italics added.) Given the commonality between the intended target and the actual victim, there is no bar to imposing liability under those circumstances. (*Id.* at p. 1027 & fn. 5.)

Barnett argues *Williams* is not controlling because that case involved the general intent offense of assault, not the specific intent crime of attempted murder. For purposes of the present case, that is a distinction without a difference. *Williams* determined there are two situations in which a defendant can be liable for assaulting an unintended victim: (1) In the case of victim misidentification, "where the defendant actually commits an assault against the wrong person," or (2) under the theory of transferred intent "where the defendant intends to commit an assault against one party, but

8

through faulty aim, actually causes some physical harm to another person." (*Williams, supra,* 102 Cal.App.3d at p. 1028.)

*Williams* has been criticized for extending the transferred intent theory to the general intent crime of assault. (See *People v. Lee* (1994) 28 Cal.App.4th 1724, 1736–1738 [because assault is a general intent crime, there is no specific intent to transfer].) However, that criticism is irrelevant here because, as explained above, Barnett's culpability for attempting to murder Kelly does not depend on the theory of transferred intent. Instead, his culpability rests on the mistaken identification theory, which applies to both general intent crimes like assault (*Williams, supra,* 102 Cal.App.3d at p. 1028), and specific intent crimes like attempted murder. (See *People v. Jackson* (Colo. 2020) 472 P.3d 553, 559–561 [a defendant cannot escape liability for attempted murder just because his intended target turned out to be someone other than he expected]; *People v. Migliore* (1988) 170 Ill.App.3d 581, 589–590 [same].)

Therefore, it does not matter that Barnett intended to kill someone other than Kelly. The fact Barnett mistook the victim's identity is immaterial in assessing his liability for attempted murder.

Barnett's secondary attack on the trial court's ruling is factual. He contends that, irrespective of whether he perceived Kelly to be a friend or foe, there is insufficient evidence to support the court's finding that he actually intended to kill that person. Barnett points out that, in warning his fellow gang members about the person who turned out to be Kelly, he neither identified that person as a rival gang member nor expressly encouraged his cohorts to shoot at him.

On the other hand, Barnett issued the warning in the context of a planned attack of extreme violence. He and his fellow gang members were in

9

rival territory to avenge a recent killing of their comrade Jones. They were armed to the teeth, and Barnett was on the lookout for potential threats when he ran back to his group and warned that a man with a shotgun was coming toward them.

Under these circumstances, the trial court could reasonably infer Barnett intended Davis or someone else in his gang to shoot and kill the approaching gunman, as either an offensive or defensive tactic. Although it is possible Barnett issued the warning without malicious intent, that possibility is insufficient to undermine the court's contrary conclusion. (*People v. Vargas* (2020) 9 Cal.5th 793, 820 [if the trier of fact's determinations are supported, reversal is not warranted even if the facts are reasonably susceptible of contrary findings].)

In sum, there is no legal or factual basis for disturbing the trial court's finding that Barnett aided and abetted the attempted murder of Kelly with the intent to kill. Because that finding renders Barnett ineligible for relief, the court properly denied his petition for resentencing.

## DISPOSITION

The trial court's postjudgment order denying Barnett's petition for resentencing is affirmed.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.